IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No. 7:20-CV-236-D

ATLANTIC CORPORATION OF )
WILMINGTON, INC., )
)
                        Plaintiff, )
)                      **ORDER**
        v. )
)
TBG TECH CO., LLC, JOHANNES )
FLOE, STARLEY LAW, PLLC, and )
MATTHEW STARLEY, )
)
                        Defendants. )

On November 30, 2020, Atlantic Corporation of Wilmington, Inc. ("Atlantic" or "plaintiff")

filed an amended complaint against TBG Tech Co., LLC ("TBG Tech"), Johannes Floe ("Floe"),

Starley Law, PLLC ("Starley Law"), and Matthew Starley ("Starley") (collectively "defendants")

alleging (1) breach of contract against TBG Tech, (2) unjust enrichment against TBG Tech, (3)

fraudulent representation against TBG Tech and Floe, (4) negligent misrepresentation against TBG

Tech and Floe, (5) negligent misrepresentation against Starley Law, and (6) negligent

misrepresentation against Starley. See Am. Compl. [D.E. 5-1]. Atlantic's complaint stems from its

payment of $971,572.50 for gloves that Atlantic expected to receive and to be able to resell in

connection with the COVID-19 pandemic. See id. Defendants TBG Tech and Floe are Florida

residents. Defendants Starley and Starley Law are Utah residents. Defendants moved to dismiss for

lack of personal jurisdiction. See [D.E. 23, 35]. Atlantic responded in opposition [D.E. 29, 38], and

defendants replied [D.E. 34, 39]. On August 19, 2021, the court held a hearing concerning the

motions. As explained below, the court lacks specific personal jurisdiction over the defendants and grants defendants' motions to dismiss for lack of personal jurisdiction.

## I.

Atlantic is headquartered in Wilmington, North Carolina, and sells packaging supplies and packaging systems throughout the United States, including personal protective equipment ("PPE") products associated with the COVID-19 pandemic. See Farmer Aff. [D.E. 30] ¶ 2. Eric Farmer ("Farmer") is vice president of Atlantic and is based in Atlantic's Charlotte, North Carolina office. At all relevant times, Farmer was in North Carolina. See id. ¶ 3.

Matthew Starley is a resident of Utah and was in Utah at all relevant times. See Starley Decl. [D.E. 35-1] ¶ 2. Starley Law is a Utah professional limited liability company with its principal place of business in Utah. Starley is Starley Law's sole owner and employee. See id. ¶ 3. Although Starley is a licensed Utah attorney in good standing with the Utah State Bar, practicing law has not been Starley's primary source of income for several years. See id. ¶ 4. Starley Law provides limited legal services to a handful of existing clients. See id.

Over the past several years, Starley's work has focused on the medical supply industry. Starley owns part of LifeTech Distribution, LLC ("LifeTech"). LifeTech, a Utah limited liability company, produces hand sanitizing gel through contract manufacturers and then sells it wholesale to distributors and retailers. See id. ¶ 5. Until August 2020, Starley also partially owned a pharmaceutical supply company called Wellgistics, LLC ("Wellgistics"). See id. Starley had no contacts with North Carolina concerning his work with LifeTech or Wellgistics. See id.

Starley and Starley Law do not maintain offices or agents or own property in North Carolina. See id. ¶¶ 6–7. Starley and Starley Law have not deliberately engaged in significant or long-term

2

business activities in North Carolina. See id. ¶ 8. Starley has never been to North Carolina, and Starley Law has never had any clients from North Carolina. See id.

Starley met Floe in January 2020. See id. ¶ 9. Floe is a permanent resident of the United States and a resident of Florida. See Floe Decl. [D.E. 24-1] ¶ 1. Floe is the owner, director, and managing member of TBG Tech. See id. ¶ 3. TBG Tech, a Florida limited liability company with its principal place of business in New York, distributes and resells PPE. See id. ¶¶ 4–5. TBG Tech and Floe do not maintain an office or other property in North Carolina. See id. ¶ 7. They do not have employees in North Carolina. See id. And they have not intentionally engaged in significant or long-term business activities in North Carolina. See id. ¶ 8.

Within a couple months of meeting Floe, Starley and several of Starley's business partners from Wellgistics began to discuss business matters with Floe. See Starley Decl. [D.E. 35-1] ¶ 9. As discussions evolved in early 2020, Floe told Starley that Floe could source medical PPE, including nitrile gloves, NIOSH-certified N95 masks, three-ply surgical masks, and other items directly from the world's top PPE manufacturers. See id. ¶ 10. In May 2020, Starley and his business partners agreed to join a new business with Floe focused on sourcing and selling medical PPE, for which demand had skyrocketed due to the COVID-19 pandemic. See id. ¶ 11. Floe wanted to conduct this business through TBG Tech. Co. See id. Floe and Starley later converted TBG Tech into a Florida limited liability company and renamed it TBG Tech. Co., LLC. See id.

Starley, his business partners, and Floe orally agreed that Floe (or an entity Floe owned) would own fifty percent of TBG Tech, and Starley and his business partners would collectively own the other fifty percent. See id. ¶ 12. Based on this oral agreement, which Starley and Floe planned to formalize in a written operating agreement, Starley and Floe proceeded with the understanding that Starley and Floe were co-owners of TBG Tech. See id. Consistent with Starley's status as a co-

3

owner, Floe issued two TBG Tech email addresses to Starley: "matthew@tbgtechco.com" and "legal@tbgtechco.com." See id. ¶ 14.

Starley and his partners provided substantial start-up funds to Floe and TBG Tech, including $2.5 million intended to secure PPE production in China and $250,000 for legal fees and other similar expenditures. See id. ¶ 12. In addition to Starley and Floe's oral agreement, several other factors made Starley comfortable investing $2.75 million in TBG Tech. See id. ¶ 13. Based on Starley and Floe's interactions, Floe appeared to have substantial means, extensive business experience and expertise, and many international business contacts. See id. Hogan Lovells, a reputable and sophisticated international law firm, represented Floe. See id. Floe also provided Starley with documentation showing that TBG Tech was an authorized distributor for at least three PPE manufacturers, including two from China and one from South Africa. See id.

Early on, TBG Tech accomplished at least three transactions using Floe's international manufacturing contacts. See id. ¶ 15. In late June or early July 2020, TBG Tech successfully sourced hundreds of thousands of "back to school" kits containing three-ply masks, sanitizing wipes, and hand sanitizer. See id. ¶ 16. In early July 2020, TBG Tech sourced 100,000 NIOSH-certified N95 masks. See id. ¶ 17. In early to mid-July 2020, TBG Tech completed a transaction for 1 million NIOSH-certified N95 masks. See id. ¶ 18.

On June 26, 2020, Atlantic placed an order for nitrile gloves (the "gloves") with Fountainhead PPE ("Fountainhead"), a company based in Mount Pleasant, South Carolina. See Farmer Aff. [D.E. 30] ¶ 5; see Ex. A. [D.E. 30-1]. Atlantic split its order into two purchase orders. See Ex. A [D.E. 30-1]. The first purchase order was for $266,000 worth of gloves and specified that Atlantic would front 100% of the cost. See id. at 2–3. The second purchase order was for $769,908 worth of gloves and specified that Atlantic would pay 30% up front and pay 70% once the gloves

4

shipped. See id. at 4–5.[1] Both purchase orders specified that Atlantic would advise Fountainhead about how to ship the gloves. See id. at 2–5.

Charles Jenkins ("Jenkins"), a South Carolina resident and one of Starley's business associates at LifeTech (a Utah company), connected Fountainhead to TBG Tech. Specifically, Jenkins had a relationship with Fountainhead and learned that Atlantic needed gloves. See Starley Decl. [D.E. 35-1] ¶¶ 20–21. Jenkins also knew that Floe had told Starley and the others involved with TBG Tech that TBG Tech had reliable manufacturers from which to source gloves. In turn, Jenkins and Fountainhead began discussing whether to source the gloves for Atlantic through TBG Tech. See id. ¶ 21. Neither Starley nor Floe personally contacted Fountainhead or Atlantic to solicit this business. Rather, Jenkins presented the opportunity from Fountainhead to TBG Tech (through Starley). See id.

At some point, Starley became involved in discussions between Jenkins and Fountainhead. Starley learned that Fountainhead had sourced gloves for Atlantic from a different supply channel, that Fountainhead had communicated pricing to Atlantic based on this other supply channel, and that Atlantic had approved the pricing, issued purchase orders to Fountainhead for the gloves, and paid Fountainhead the purchase price for the gloves. See id. ¶ 22; cf. Ex. A. [D.E. 30-1]. Starley also learned that Fountainhead had become uncomfortable with its existing supply channel's ability to deliver the gloves, and Fountainhead decided to source the gloves through TBG Tech instead. See Starley Decl. [D.E. 35-1] ¶ 23.

On July 15, 2020, Fountainhead formalized its arrangement with TBG Tech by issuing two purchase orders (the "Fountainhead POs"). See Ex. B [D.E. 30-2]. The Fountainhead POs totaled

[1] Despite specifying two payments, Atlantic apparently advanced the entire cost up front.

5

$971,572.50 and mistakenly listed "LifeTech Distribution" as the vendor instead of TBG Tech. See id.; Starley Decl. [D.E. 35-1] ¶ 24. After receiving the Fountainhead POs, either Jenkins or Starley clarified to Fountainhead that LifeTech was not involved in this transaction and that TBG Tech would source the gloves. See Starley Decl. [D.E. 35-1] ¶ 24.[2]

The Fountainhead POs identified Atlantic's Charlotte, North Carolina facility as the gloves' shipping destination but also stated that the gloves would be shipped "EXW FACTORY." Ex. B [D.E. 30-2]. EXW FACTORY means that the seller (i.e., TBG Tech) is responsible only for making the goods available for pickup at the factory where they were manufactured, at which point the buyer (i.e., Fountainhead or Atlantic) takes ownership of the goods and is responsible for shipping them to their ultimate destination (i.e., North Carolina). See Starley Decl. [D.E. 35-1] ¶ 25; see also Ex Works, Black's Law Dictionary (11th ed. 2019).

Starley forwarded the Fountainhead POs to Floe, and Floe issued two invoices from TBG Tech to Fountainhead documenting the proposed transaction. See Starley Decl. [D.E. 35-1] ¶ 26; Ex. F [D.E. 30-6]. The TBG Tech invoices listed "Jay Floe" as the responsible salesperson and listed Atlantic's Charlotte facility as the ultimate shipping destination. See Ex. F [D.E. 30-6]. However, the invoices stated slightly different shipping terms than the Fountainhead POs. See id. One invoice reflected shipping terms of "FOB Int. Cargo Port[,]" and the other invoice specified "FOB Int. Cargo Airport." Id. These terms meant that Fountainhead or Atlantic would take ownership of the gloves at the international seaport or airport, respectively, and then be responsible

---

[2] Starley was TBG Tech's agent for the gloves transaction. See Starley Decl. [D.E. 35-1] ¶¶ 22–26. The court does not credit Floe's contrary testimony. See Floe Decl. [D.E. 24-1] ¶ 15. Instead, the court credits Starley's testimony that he was TBG Tech's agent and that the purchase orders' reference to LifeTech Distribution was an error. The purchase orders should have referenced TBG Tech. See Starley Decl. [D.E. 35-1] ¶ 24.

6

for shipping the gloves by boat or air to North Carolina. See Starley Decl. [D.E. 35-1] ¶ 26. TBG Tech had no obligation or intent to deliver the gloves to Atlantic in North Carolina. See Floe Decl. [D.E. 24-1] ¶ 31. Fountainhead sent the TBG Tech invoices to Farmer at Atlantic. See Farmer Aff. [D.E. 30] ¶ 11.

To facilitate the transaction with TBG Tech, Fountainhead entered into an escrow agreement with Starley Law. Fountainhead was uncomfortable with the escrow account where it was holding Atlantic's payments for the gloves because the account belonged to the attorney for the seller Fountainhead no longer planned to use. See Starley Decl. [D.E. 35-1] ¶ 27. Starley offered that Fountainhead could escrow the funds in Starley Law's Utah account. See id. Fountainhead agreed to use the account, and Fountainhead's attorney drafted an escrow agreement. See id. Starley solicited Floe's approval of the arrangement before Starley signed the escrow agreement. See id. On July 17 and 18, 2020, Michael Bailey ("Bailey"), Fountainhead's owner, and Starley signed the escrow agreement. See Ex. D [D.E. 30-4]; cf. Farmer Aff. [D.E. 30] ¶ 24 (stating Bailey's job title).

Under the escrow agreement, Fountainhead deposited the funds that Atlantic advanced for the gloves in escrow with Starley Law for eventual release to TBG Tech in payment for the gloves. See Farmer Aff. [D.E. 30] ¶ 8. The escrow agreement identifies Atlantic as a third-party beneficiary with specific authority to enforce the escrow agreement as if Atlantic were a party to the agreement. See id.; Ex. D [D.E. 30-4] 3.

Starley Law did not charge any fees to Fountainhead or TBG Tech concerning the escrow account. See Starley Decl. [D.E. 35-1] ¶ 28. The escrow agreement was the only time Starley Law acted as an escrow agent for a TBG Tech or any other PPE-related transaction. See id. Starley devised this one-time solution based on Fountainhead's expressed need for an alternative escrow

7

arrangement. See id. On July 20, 2020, Fountainhead wired the purchase funds of $971,572.50 to Starley Law's escrow account. See id. ¶ 29; Farmer Aff. [D.E. 30] ¶ 10.

On July 20, 2020, Starley asked Floe via text message whether TBG Tech could provide an SGS report for the gloves. An SGS report is "a third-party verification that the goods in question are what they are supposed to be." Starley Decl. [D.E. 35-1] ¶ 30. Floe responded that TBG Tech could provide a report once it received the purchase funds from Atlantic. See id. Floe also stated to Starley that the gloves "will be ready for pickup within a day of payment." Id. Based on the information Starley had—including Starley's interactions with and observations of Floe and the documentation Floe had provided to Starley about his relationships with PPE manufacturers—Starley believed and trusted Floe's statements. See id.

On July 21, 2020, Starley emailed Bailey asking for confirmation to wire the escrow funds from Starley Law to TBG Tech. See id. ¶ 31; Ex. G [D.E. 30-7] 4. Starley's email recited what Floe had told Starley, namely that upon receiving the funds, "TBG Tech will then wire the funds to Asia for the purchase of the gloves. The SGS inspection and report will be provided after receipt of the funds and the product may be immediately picked up thereafter." Ex. G [D.E. 30-7] 4; see Starley Decl. [D.E. 35-1] ¶ 31. Bailey forwarded the email to Farmer to approve the wire transfer. See Ex. G [D.E. 30-7] 3. Farmer asked Bailey what would happen if there was a bad SGS report, assuming TBG Tech would not wire the funds until TBG Tech had a good report or was confident there would be one. See id.

After receiving Farmer's question, Starley called Floe and asked how to respond. See Starley Decl. [D.E. 35-1] ¶ 32. Floe told Starley that TBG Tech had four other manufacturers who could supply the gloves if Floe's first option fell through, and if necessary, TBG Tech could fill the entire order from one of those manufacturers within twelve hours. See id. During this conversation, Floe

8

also told Starley that he advanced funds for the purchase of the gloves to VGlove, the manufacturer in Vietnam, to keep the process moving. See id.; cf. Farmer Aff. [D.E. 30] ¶ 15 (stating VGlove was the manufacturer). Starley believed Floe was telling the truth. See Starley Decl. [D.E. 35-1] ¶ 32.

After communicating with Floe, Starley responded to Farmer's email inquiry by conveying this information to Farmer as Floe had stated it to Starley. See id. ¶ 33. Specifically, Starley replied that "TBG has four other manufacturers and has represented that they will obtain satisfactory supply from another one within 12 hours if necessary." Ex. G [D.E. 30-7] 3. Starley added, "TBG Tech went ahead and advanced the money to Asia in order to keep the process moving. I have not released your funds to them yet, but would like to as soon as I have the green light." Id. Relying on these assurances from Starley, Farmer authorized Starley Law to release the funds to TBG Tech. See id. at 2.

After this July 21, 2020 email exchange, Starley Law in Utah released the $971,572.50 in escrowed funds to TBG Tech in Florida. See Starley Decl. [D.E. 35-1] ¶ 34. On July 22, 2020, TBG Tech received a wire payment for the Fountainhead POs from Starley Law's escrow account. See Floe Decl. [D.E. 24-1] ¶ 29. TBG Tech then remitted the funds to VGlove, per their agreement, so that VGlove would release the gloves to Fountainhead. See id. ¶ 30.

The same day, Atlantic and Fountainhead sought to put Atlantic's logistics provider in touch with VGlove to pick up the gloves. See Farmer Aff. [D.E. 30] ¶ 14. To do so, Bailey introduced Starley by email to Atlantic's logistics representatives, Sean Clark and Warren McArthur, who would coordinate Atlantic's acceptance of the gloves in Vietnam. See Ex. I [D.E. 30-9] 5–6; Starley Decl. [D.E. 35-1] ¶ 35. On July 22, 2020, Starley responded and introduced the Atlantic logistics representatives to Floe, who was copied on the email. See Farmer Aff. [D.E. 30] ¶ 14; Ex. I [D.E. 30-9] 4. In the email, Starley said that Floe "and others he may task from our team will be in touch

9

to help finalize the logistics." Ex. I [D.E. 30-9] 4. Starley also confirmed TBG Tech had initiated the wire transfer to VGlove the previous day. See id. at 2. At this point, Starley believed TBG Tech was on track to fulfill the order. See Starley Decl. [D.E. 35-1] ¶ 35. After these communications, McArthur of Atlantic added his contact in Vietnam, who worked for Mekong Cargo Freight Company, to the email chain to better facilitate communication. See Ex. I [D.E. 30-9] 2–3; cf. Floe Decl. [D.E. 24-1] ¶ 32.

On July 23, 2020, Atlantic and Fountainhead were still awaiting confirmation that VGlove had received the wired funds and that the gloves were ready for pickup. See Farmer Aff. [D.E. 30] ¶ 15. Starley informed Farmer that he expected to hear from Vietnam that night. See id.; Ex. J [D.E. 30-10] 3. The next day, Starley again emailed Farmer with hopes that the gloves would arrive "at some point today." Farmer Aff. [D.E. 30] ¶ 15; see Ex. J [D.E. 30-10] 2.

On July 26, 2020, with no word from VGlove and no confirmation the gloves were ready for pickup, Starley emailed Farmer, copying representatives from Fountainhead on the email. See Ex. K [D.E. 30-11] 2. Starley said that TBG Tech was "committed to being a good long term partner to" Atlantic and Fountainhead, that TBG Tech was "an authorized distributor of record for both Mascot One (gloves) and BYD (masks)," and that TBG Tech was "communicating directly with their factories and upper management" to "get this deal across the finish line in the next 36 hours." Id. Starley attached an email from Floe and a press release reflecting that BYD Care products had placed TBG Tech on its website, as well as a document showing TBG Tech was an authorized distributor of Mascot One. See id. at 3–6.

On July 30, 2020, Chris Grant ("Grant"), who identified himself to Farmer as TBG Director-Europe and who supposedly had high-level connections with VGlove, emailed Farmer with assurances that the order had been delayed due to miscommunications but that VGlove had received

the funds the previous Monday (i.e., July 27, 2020) and that Grant hoped to resolve the matter that day. See Farmer Aff. [D.E. 30] ¶ 17; Ex. L [D.E. 30-12] 7–8. Grant added that he had instructed VGlove to contact Atlantic's logistics team in Vietnam to expedite shipping. See Ex. L [D.E. 30-12] 8. In phone calls with Farmer, Grant repeated these assurances and told Farmer his connections with VGlove were at the "ownership family/board level." Farmer Aff. [D.E. 30] ¶ 17.

On July 31, 2020, Farmer emailed Grant and said VGlove had not contacted Atlantic's logistics team and that the "transaction ha[d] become a concern to" Atlantic based on Grant's "description of the funds receipt" and the factory's failure to acknowledge the order to Atlantic's logistics team. Ex. L [D.E. 30-12] 6–7; see Farmer Aff. [D.E. 30] ¶ 17. On August 3, 2020, Grant responded that TBG Tech was speaking with VGlove on an hourly basis and that the order was on track. See Farmer Aff. [D.E. 30] ¶ 17; Ex. L [D.E. 30-12] 5–6. On August 5, 2020, Grant emailed Atlantic's contact at Mekong Cargo to say Mekong Cargo would receive information about the order that night. See Farmer Aff. [D.E. 30] ¶ 17; Ex. L [D.E. 30-12] 3–4. No such communication occurred. See Farmer Aff. [D.E. 30] ¶ 17.

On August 8, 2020, Farmer emailed Grant and Starley, saying that the gloves needed to be loaded and shipped or the money refunded to Atlantic by August 11, 2020. See id. In reply, Starley thanked Farmer for Atlantic's patience, indicated that TBG Tech would make a "special effort" to make the VGlove shipment happen, and indicated that Starley had alerted the team regarding the deadline and the request for a refund. Ex. L [D.E. 30-12] 2; see Farmer Aff. [D.E. 30] ¶ 17.

The VGlove shipment never materialized. See Farmer Aff. [D.E. 30] ¶ 18. On August 11, 2020, Starley called Farmer to tell him that the TBG Tech team felt terribly about the failure of the VGlove shipment. See id. Starley said that TBG Tech was prepared to airfreight Atlantic's entire order to Charlotte, provided Atlantic could accept a brand of gloves called "Healthy Glove" made

by Sri Trang, a manufacturer in Thailand. See id. Starley said Healthy Glove had the same specifications as those Atlantic had ordered from VGlove. See id. Starley explained that the gloves would land at the Los Angeles Airport ("LAX") and then TBG Tech would pay to transport them to Charlotte. See id.; see also Ex. M [D.E. 30-13] 2. Starley said that the air shipment was scheduled to happen immediately and that Atlantic's shipment would be coming with the gloves shipment of a much larger customer. See Farmer Aff. [D.E. 30] ¶ 18.

On August 11, 2020, Farmer began communicating with Starley about the timing of the glove shipment from Thailand. See id. ¶ 19. On August 12, 2020, Starley texted Farmer that he had been told the plane was loaded and would arrive at LAX the following day. See id.; Ex M [D.E. 30-13] 2. Farmer responded that when the gloves landed in Los Angeles, Atlantic would arrange to transport the gloves to Charlotte. See Farmer Aff. [D.E. 30] ¶ 19; Ex M [D.E. 30-13] 2.

On August 13, 2020, Starley texted Farmer that the gloves had "cleared Thai customs" and would land in LAX the next day. Ex. M [D.E. 30-13] 4. Farmer responded with a request for confirmation and a contact so that Atlantic could arrange transport to North Carolina. See id. On August 14, 2020, Starley texted Farmer that he was still waiting on the airway bills for the glove shipment. See id. at 5; Farmer Aff. [D.E. 30] ¶ 19. On August 15, 2020, Starley texted Farmer with an apology and said he "would have the paperwork when Thailand opens tomorrow." Ex. M [D.E. 30-13] 8; see Farmer Aff. [D.E. 30] ¶ 19.

On August 17, 2020, Starley texted Farmer with another apology, but Starley said that he was confident in the supply and believed it would come through but was concerned about the timing. See Farmer Aff. [D.E. 30] ¶ 19; Ex. M [D.E. 30-13] 10–11. Farmer responded that he needed a detailed update, even if it included bad news. See Farmer Aff. [D.E. 30] ¶ 19; Ex. M [D.E. 30-13] 12. Starley responded that his information was coming from Floe, that these were Floe's

12

relationships, and that Floe was told the gloves had cleared Thai customs the previous Thursday. See Farmer Aff. [D.E. 30] ¶ 19; Ex. M [D.E. 30-13] 13–14. Starley also responded that Atlantic's order was part of TBG Tech's first shipment with this factory pursuant to a contract for 210 million boxes of gloves. See Farmer Aff. [D.E. 30] ¶ 19; Ex. M [D.E. 30-13] 13–14. Starley believed the gloves would be delivered "this week." See Ex. M [D.E. 30-13] 14.

On August 18, 2020, with no more information forthcoming, Starley texted Farmer that he had talked with all of his partners except Floe and that Starley would arrange a conference call for Fountainhead representatives and Starley to talk with Floe. See id. at 17; Farmer Aff. [D.E. 30] ¶ 19. That afternoon, Floe, Starley, Bailey, and Sundance Rivera (of Fountainhead) participated in the conference call. See Farmer Aff. [D.E. 30] ¶ 20. Floe discussed the global nitrile glove market and the problems with VGlove that caused the issue with nondelivery. See id. Floe stated that he and his team had anticipated these issues and that he had formed a new relationship with Thai manufacturer Sri Trang. See id. According to Floe, TBG Tech had a $500 million line of credit with Sri Trang and a formal agreement giving TBG Tech priority to purchase any product in Sri Trang's stock. See id. Floe promised to have his lawyers remind Sri Trang of their contractual obligations to TBG Tech and threaten that Sri Trang was in breach of those obligations. See id.

On August 19, 2020, Starley texted Farmer that Floe was told the gloves were at Krabi International Airport in Thailand. See id. ¶ 21; Ex. N [D.E. 30-14] 2–3. On August 20, 2020, Farmer asked for updates. See Farmer Aff [D.E. 30] ¶ 21; Ex. N [D.E. 30-14] 4. After consulting with Floe, Starley responded that TBG Tech did not have the airway bill for the shipment yet, but the manufacturer told Floe's attorney they would receive the airway bill "tomorrow or Monday." Ex. N [D.E. 30-14] 6; see Farmer Aff. [D.E. 30] ¶ 21. Still, TBG Tech delivered no gloves. See Farmer Aff. [D.E. 30] ¶ 22.

On August 24, 2020, Farmer emailed Starley and Floe demanding a full refund to Atlantic. See id.; Ex. O [D.E. 30-15] 2. The same day, Starley texted Farmer, saying that he had spoken with Floe and that they agreed it was best to process a refund. See Farmer Aff. [D.E. 30] ¶ 22; Ex. O [D.E. 30-15] 3.

On August 25, 2020, Floe responded to Farmer with an email stating that he had requested a refund. See Farmer Aff. [D.E. 30] ¶ 22; Ex. O [D.E. 30-15] 4. On August 26, 2020, Starley texted Farmer and said, "We have requested a return of the wire. It will take several days to process." Ex. P [D.E. 30-16] 2. Starley promised to talk to Floe the following day to get details and an update on the timing of the reverse wire transfer. See id.; Farmer Aff. [D.E. 30] ¶ 23.

On September 1, 2020, Starley emailed Farmer that the reverse wire was delayed because TBG Tech's banker was not in the office; however, Starley assured Farmer that TBG Tech had executed the reverse wire and that the funds would be returned by the end of the first week of September. See Farmer Aff. [D.E. 30] ¶ 23; Ex. P [D.E. 30-16] 4. On September 4, 2020, Starley followed up to confirm that if the wire did not go through that day then it would transmit the day after the Labor Day holiday on September 8, 2020. See Farmer Aff. [D.E. 30] ¶ 23; Ex. P [D.E. 30-16] 3.

On September 9, 2020, Starley texted Farmer that Floe said the money had been out of TBG Tech's account since the previous week and that Floe was running a trace on the transaction. See Farmer Aff. [D.E. 30] ¶ 23; Ex. P [D.E. 30-16] 5–6. On September 11, 2020, Starley texted Farmer that Floe was going to the bank to try to resolve the problem. See Ex. P [D.E. 30-16] 7. On September 14, 2020, Atlantic initiated a conference call with Floe and Starley to discuss the return of the funds, but the call never materialized. See id. at 8; Farmer Aff. [D.E. 30] ¶ 23. On September 18, 2020, Starley texted Farmer that he was communicating with Floe regarding the reverse wire.

14

On September 22, 2020, Starley texted Farmer that Floe was committed to resolving the issue with his bank and would find an alternative way to return the funds if the bank could not execute the reverse wire. See Farmer Aff. [D.E. 30] ¶ 23; Ex. P [D.E. 30-16] 10.

On September 26, 2020, Starley texted Farmer that Floe would wire the money directly to the escrow account instead of attempting a reverse wire transfer. See Farmer Aff. [D.E. 30] ¶ 23; Ex. P [D.E. 30-16] 12. Nick Arnold of Atlantic's finance department and Farmer asked for evidence of Floe's and TBG Tech's attempts to reverse wire the money, but TBG Tech never produced such evidence. See Farmer Aff. [D.E. 30] ¶ 23. At around this time, Atlantic's attorneys sent a demand letter for the funds. See id. On September 29, 2020, Starley texted Farmer that Floe "said he will get it paid this week." Ex. P [D.E. 30-16] 13.

On October 12, 2020, Farmer asked Starley to set up a call with Floe to make progress toward payment and to prevent legal action. See Farmer Aff. [D.E. 30] ¶ 23; Ex. P [D.E. 30-16] 14. On October 13, 2020, Starley texted Farmer that Floe did not see value in conversation; however, Floe wanted a release agreement from Atlantic. See Farmer Aff. [D.E. 30] ¶ 23; Ex. P [D.E. 30-16] 15–16. Once Atlantic signed the release agreement, TBG Tech would pay immediately. See Farmer Aff. [D.E. 30] ¶ 23; Ex. P [D.E. 30-16] 16. On October 14, 2020, Atlantic's lawyers drafted a proposed release, which Farmer sent to Floe and Starley for signature. See Farmer Aff. [D.E. 30] ¶ 24. The release agreement included Atlantic and Fountainhead. Roger Teague (Atlantic executive vice president) and Bailey signed it. See id. Notwithstanding this release, Atlantic never received payment. See id.

After TBG Tech failed to refund Atlantic, Starley and his business partners notified Floe that they wished to terminate their relationship with TBG Tech and asked Floe to refund the more than $3 million Starley and his partners had collectively contributed to TBG Tech. See Starley Decl.

15

[D.E. 35-1] ¶ 39. In response, Floe immediately revoked the TBG Tech email accounts he had provided to Starley. See id.

On October 27, 2020, Atlantic sued the defendants (except Floe) in New Hanover County Superior Court. See [D.E. 1-1]. On November 30, 2020, Atlantic filed an amended complaint adding Floe to the action and revising its claims against the defendants. See [D.E. 5-1]. On December 1, 2020, defendants removed the lawsuit to this court based on diversity jurisdiction. See [D.E. 1]; cf. [D.E. 5]. Defendants moved to dismiss for lack of personal jurisdiction. See [D.E. 23, 35]. Atlantic responded in opposition. See [D.E. 29, 38].

## II.

Where a court holds a pretrial evidentiary hearing, a plaintiff must prove personal jurisdiction over each nonresident defendant by a preponderance of the evidence. See Grayson v. Anderson, 816 F.3d 262, 267–69 (4th Cir. 2016). Here, the court held a pretrial evidentiary hearing. Thus, Atlantic must prove personal jurisdiction by a preponderance of the evidence. See id.; Sneha Media & Ent., LLC v. Associated Broad. Co. P, 911 F.3d 192, 196–97 (4th Cir. 2018); Mylan Lab'ys., Inc. v. Akzo, N.V., 2 F.3d 56, 60 (4th Cir. 1993).

Floe and TBG Tech are Florida residents. Starley and Starley Law are Utah residents. The court does not have personal jurisdiction over a nonresident defendant unless jurisdiction comports with North Carolina's long-arm statute and the Fourteenth Amendment's Due Process Clause. See, e.g., Mitrano v. Hawes, 377 F.3d 402, 406 (4th Cir. 2004). North Carolina's long-arm statute extends personal jurisdiction over nonresident defendants consistent with the Fourteenth Amendment's Due Process Clause. See Christian Sci. Bd. of Dirs. v. Nolan, 259 F.3d 209, 215 (4th Cir. 2001). Thus, the statutory inquiry merges with the constitutional inquiry. See id.

16

Due process requires a defendant to have "certain minimum contacts with the forum such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." Helicopteros Nacionales de Colom., S.A. v. Hall, 466 U.S. 408, 414 (1984) (alteration and quotations omitted). The minimum contacts analysis focuses on whether a defendant "purposefully directed his activities at residents of the forum" and whether the causes of action arise out of or relate to those activities. Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985); see Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1024–25 (2021). The analysis ensures that a defendant is not haled into a jurisdiction's court "solely as a result of random, fortuitous, or attenuated contacts." Burger King, 471 U.S at 475 (quotations omitted); see Ford Motor Co., 141 S. Ct. at 1025. The analysis focuses "on the relationship among the defendant, the forum, and the litigation." Walden v. Fiore, 571 U.S. 277, 284 (2014) (quotation omitted); see Ford Motor Co., 141 S. Ct. at 1024–25; Bristol-Myers Squibb Co. v. Superior Ct., 137 S. Ct. 1773, 1781 (2017).

The extent of the contacts needed for jurisdiction turns on whether the claims asserted against a defendant relate to or arise out of the defendant's contacts with the forum state. See Ford Motor Co., 141 S. Ct. at 1025; Bristol-Myers Squibb, 137 S. Ct. at 1780; ALS Scan, Inc. v. Dig. Serv. Consultants, Inc., 293 F.3d 707, 712 (4th Cir. 2002). If the defendant's contacts with the state are the basis for the suit, specific jurisdiction may exist. ALS Scan, 293 F.3d at 712. In determining specific jurisdiction, the court considers: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." Id. (alteration and quotations omitted). Thus, the "constitutional touchstone" of specific personal jurisdiction "remains whether the defendant purposefully

established minimum contacts in the forum State." Burger King Corp., 471 U.S. at 474 (quotation omitted); see Bristol-Myers Squibb, 137 S. Ct. at 1781–82; Walden, 571 U.S. at 284–91.[3]

First, in analyzing the extent to which a defendant purposefully availed itself of the privilege of conducting activities within a State, a court examines "various non-exclusive factors" including:

> (1) whether the defendant maintained offices or agents in the State; (2) whether the defendant maintained property in the State; (3) whether the defendant reached into the State to solicit or initiate business; (4) whether the defendant deliberately engaged in significant or long-term business activities in the State; (5) whether a choice of law clause selects the law of the State; (6) whether the defendant made in-person contact with a resident of the State regarding the business relationship; (7) whether the relevant contracts required performance of duties in the State; and (8) the nature, quality, and extent of the parties' communications about the business being transacted.

UMG Recordings, Inc. v. Kurbanov, 963 F.3d 344, 352 (4th Cir. 2020) (quotation omitted); see Consulting Eng'rs Corp. v. Geometric Ltd., 561 F.3d 273, 278 (4th Cir. 2009).

Second, the plaintiff's claims must have arisen out of or relate to those activities that the defendant directed at the State. See Ford Motor Co., 141 S. Ct. at 1026–32; UMG Recordings, 963 F.3d 354–55.

Third, the court must analyze whether the exercise of personal jurisdiction is constitutionally reasonable. See Ford Motor Co., 141 S. Ct. at 1030; Bristol-Myers Squibb, 137 S. Ct. at 1780–81; Burger King, 461 U.S. at 476–78; World-Wide Volkswagon, 444 U.S. at 292; Consulting Eng'rs,

---

[3] If a defendant's contacts with the forum state are not the basis of the causes of action, general jurisdiction may "arise from the defendant's general, more persistent, but unrelated contacts with the State." ALS Scan, 293 F.3d at 712. To establish general jurisdiction, a defendant's contacts with the forum state must be both continuous and systematic. The general jurisdiction standard is more demanding than the specific jurisdiction standard. See id.; BNSF Ry. Co. v. Tyrrell, 137 S. Ct. 1549, 1558–59 (2017); Daimler AG v. Bauman, 571 U.S. 117, 131–33 (2014); Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 926–29 (2011); Helicopteros, 466 U.S. at 414–16; World-Wide Volkswagon Corp. v. Woodson, 444 U.S. 286, 291–99 (1980). Here, the parties agree that general jurisdiction does not exist.

561 F.3d at 279. This analysis "permits a court to consider additional factors to ensure the appropriateness of the forum once it has determined that a defendant has purposefully availed itself of the privilege of doing business there." Consulting Eng'rs, 561 F.3d at 279. Such factors include:

(1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social polices.

Id.

## III.

Defendants argue the court must dismiss this case for lack of specific personal jurisdiction. See [D.E. 24] 7–17; [D.E. 36] 9–15. Atlantic disagrees. See [D.E. 29] 9–17; [D.E. 38] 11–18.

### A.

Defendants argue they have not purposefully availed themselves of the privilege of conducting business in North Carolina and so do not have the minimum contacts with North Carolina necessary to justify this court exercising personal jurisdiction over them. See [D.E. 24] 9–14; [D.E. 36] 10–14. Atlantic responds that defendants purposefully availed themselves of doing business in North Carolina because: (1) Starley brought to Fountainhead's attention that TBG Tech could supply gloves for Atlantic; (2) Starley Law served as the escrow agent for the transaction and received Atlantic's payment for the gloves; (3) Starley initiated communications with Fountainhead and Atlantic to obtain approval to wire the funds to Starley Law's escrow account; (4) Starley initiated communications with Atlantic to introduce Farmer and others to Floe and other TBG employees; and (5) Starley had extensive communications via email and text message with Farmer. See [D.E. 38] 14–15. Although most of these contacts involve Starley or Starley Law, Atlantic argues they apply to Floe and TBG Tech as well because Starley was acting as TBG Tech's agent

19

in this transaction and Floe provided significant information to Starley to inform Starley's communications with Atlantic, Farmer, and Fountainhead. See id. at 2; [D.E. 29] 12. Atlantic also argues that all defendants knew Atlantic would perform its obligation to pay in North Carolina. See [D.E. 29] 12; [D.E. 38] 15.

### 1.

Atlantic's arguments fall short of establishing that defendants had the minimum contacts with North Carolina necessary to justify this court exercising specific personal jurisdiction over the defendants. As mentioned, the court considers a non-exclusive list of eight factors to decide whether defendants purposefully availed themselves of the privilege of doing business in North Carolina. See UMG Recordings, 963 F.3d at 352; Consulting Eng'rs, 561 F.3d at 278. The court focuses on "the quality and nature of the defendant's connections, not merely the number of contacts between the defendant and the forum state." UMG Recordings, 963 F.3d at 352 (emphasis omitted). The inquiry is "defendant-focused," and "the plaintiff cannot be the only link between the defendant and the forum." Walden, 571 U.S. at 284–85; see Fidrych v. Marriott Int'l, Inc., 952 F.3d 124, 138–44 (4th Cir. 2020); Sneha Media & Ent., 911 F.3d at 198–201; Perdue Foods LLC v. BRF S.A., 814 F.3d 185, 189–92 (4th Cir. 2016).

First, none of the defendants maintain offices or employees in North Carolina. Starley and Starley Law are based in Utah. See Starley Decl. [D.E. 35-1] ¶ 3. Starley has never been to North Carolina and has never represented North Carolina clients through his law firm. See id. ¶ 8. Floe and TBG Tech are based in Florida and New York. See Floe Decl. [D.E. 24-1] ¶¶ 1, 5. Neither Floe nor TBG Tech have offices, employees, or authorized agents in North Carolina. See id. ¶ 7. Second, no defendant maintains property in North Carolina. See id.; Starley Decl. ¶ 7.

20

Third, the court considers whether the defendants "reached into" North Carolina "to solicit or initiate business." UMG Recordings, 963 F.3d at 352 (quotation omitted); see Consulting Eng'rs, 561 F.3d at 278. Actions by Atlantic or a third party like Fountainhead are irrelevant to this factor because a plaintiff cannot show the requisite minimum contacts "by demonstrating contacts between the plaintiff (or third parties) and the forum State." Walden, 571 U.S. at 284. Here, none of the defendants reached into North Carolina to solicit or initiate business with Atlantic. Rather, Atlantic initiated the chain of events when it sent two purchase orders to Fountainhead, which is a South Carolina company. See Farmer Aff. [D.E. 30] ¶ 5; Ex. A [D.E. 30-1]. From there, Fountainhead sought to fulfill Atlantic's order by finding a suitable supplier. See, e.g., Starley Decl. [D.E. 35-1] ¶ 22. None of the defendants initiated contact with Fountainhead in South Carolina, much less Atlantic in North Carolina, to fill Atlantic's order. See id. ¶ 21; Floe Decl. [D.E. 30] ¶ 20. Instead, Jenkins, one of Starley's associates at LifeTech, made the connection between Fountainhead's need for a gloves supplier and TBG Tech's supposed ability to source such gloves. See Starley Decl. [D.E. 35-1] ¶¶ 20–22. Jenkins and Fountainhead brought the possible arrangement to Starley, who then presented it to Floe and TBG Tech. See id. Thus, although the court agrees with Atlantic that Starley brought the transaction to Floe and TBG Tech's attention, see [D.E. 38] 14, that argument does not support specific personal jurisdiction because in no way did Starley or the other defendants reach into North Carolina to solicit or initiate this transaction.

Fourth, the defendants have not "deliberately engaged in significant or long-term business activities in" North Carolina. UMG Recordings, 963 F.3d at 352 (quotation omitted); see Consulting Eng'rs, 561 F.3d at 278. Both Starley and Floe state that neither they, Starley Law, nor TBG Tech have ever intentionally had significant or long-term business activities in North Carolina. See Floe Decl. [D.E. 24-1] ¶ 8; Starley Decl. [D.E. 35-1] ¶ 8. And besides the transaction in this case,

21

Atlantic has identified no business operations by defendants that constitute significant or long-term business activities in North Carolina.

In opposition, Atlantic suggests that the transaction at issue here is significant given the large sum of money involved. According to Consulting Engineers, the Supreme Court's decision in Burger King exemplifies a case in which the defendants had significant or long-term business activities in the forum state. See Consulting Eng'rs, 561 F.3d at 278. Burger King involved a twenty-year franchising agreement under which defendants would pay royalties to the plaintiff exceeding $1 million. See Burger King, 471 U.S. at 464–68. Here, the Fountainhead POs totaled more than $950,000, making the amount at issue similar to that in Burger King. However, this case involves a one-off supply contract, not a "carefully structured" long-term relationship. Id. at 480. Thus, while the amount of money involved is substantial, defendants' business activities in North Carolina are not significant or long-term.

Moreover, any significance created by the amount of money involved is undercut by the Fountainhead POs' lack of connection to North Carolina. In Burger King, the Court noted that the contract itself "had a substantial connection with" the forum state." Id. at 479 (quotation and emphasis omitted). The connection was substantial because the contract "envisioned continuing and wide-reaching contacts" with the forum state. Id. at 480. Here, the Fountainhead POs are the relevant "contracts" because those are the purchase orders with which defendants were involved. The Fountainhead POs lack a substantial connection to North Carolina. Instead, the Fountainhead POs involved Fountainhead, a South Carolina company, and TBG Tech, a Florida company. See Floe Decl. [D.E. 24-1] ¶ 5; Farmer Aff. [D.E. 30] ¶¶ 5–6; Ex. B [D.E. 30-2]. The Fountainhead POs' connection to North Carolina was instead derivative of Fountainhead's separate purchase orders with Atlantic. See Ex. A [D.E. 30-1]. Accordingly, the purchase orders at issue here lack the same

22

substantial connection to North Carolina that the Burger King Court identified between the contract and the forum state in that case.

Fifth, none of the parties to the transaction executed a written contract with a choice-of-law provision, much less one specifying North Carolina law. Although the escrow agreement between Starley Law and Fountainhead contains clauses for remedies and indemnification, it contains no choice-of-law provision. Cf. Ex. D [D.E. 30-4]. This reality partially undermines Atlantic's argument that Starley Law serving as the escrow agent was a relevant contact for the purposes of personal jurisdiction. Cf. [D.E. 38] 14. None of the Fountainhead POs or the invoices TBG Tech sent to Fountainhead contain a choice-of-law provision. Cf. Ex. B [D.E. 30-2]; Ex. F [D.E. 30-6]. Thus, there is no choice-of-law provision weighing in favor of exercising personal jurisdiction in this case.

Sixth, neither Starley, Floe, nor any of their associates made "in-person contact with a resident" of North Carolina "regarding the business relationship." UMG Recordings, 963 F.3d at 352 (quotation omitted) (emphasis added); see Consulting Eng'rs, 561 F.3d at 278. Of course, the parties had significant online communications, but they had no in-person contact with each other in North Carolina.

Seventh, the parties' arrangements did not require the defendants to perform their contractual duties North Carolina. See UMG Recordings, 963 F.3d at 352; Consulting Eng'rs, 561 F.3d at 278. The Fountainhead POs specified performance "EXW FACTORY." Ex. B [D.E. 30-2]. That shipping term indicates that TBG Tech's performance obligations would be complete once it made the gloves available for pick-up at the factory in Asia where the gloves were manufactured. See Starley Decl. [D.E. 35-1] ¶ 25. TBG Tech was not required to deliver the gloves to North Carolina. Moreover, although the invoices TBG Tech sent to Fountainhead contained different shipping terms

23

than the Fountainhead POs, they also did not require TBG Tech to deliver the gloves to North Carolina. See Ex. F [D.E. 30-6]. Rather, TBG Tech would complete performance by delivering some gloves to an international seaport in Asia and the rest to an international airport in Asia. See id.; Starley Decl. [D.E. 35-1] ¶ 26. Finally, even once Farmer and Starley discussed an alternative shipping arrangement, that new arrangement did not include TBG Tech delivering the gloves to North Carolina. Instead, TBG Tech would fly the gloves into LAX and Atlantic would arrange transportation to North Carolina from there. See Ex. M [D.E. 30-13] 2–4. Accordingly, the parties' arrangements did not require TBG Tech or any other defendant to perform contractual duties in North Carolina.

Atlantic disagrees, arguing that the defendants knew Atlantic would perform its obligation to pay in North Carolina. See [D.E. 29] 12; [D.E. 38] 15. The court assumes arguendo that Atlantic was performing its payment obligations in North Carolina and not somewhere else when it approved moving funds from one trust account[4] to Starley Law's Utah account. Even so, crediting Atlantic's performance as favoring personal jurisdiction would improperly shift the locus of the purposeful availment analysis. After all, the purposeful availment analysis focuses on defendants' obligations, not Atlantic's obligations. See, e.g., Walden, 571 U.S. at 284. Furthermore, what defendants knew about Atlantic's performance obligations does not change whether defendants themselves had any performance obligations in North Carolina.

Finally, the court considers "the nature, quality, and extent of the parties' communications about the business being transacted." UMG Recordings, 963 F.3d at 352 (quotation omitted); see Consulting Eng'rs, 561 F.3d at 278. Many of Atlantic's arguments fall under this final factor.

---

[4] The record does not reflect where the original escrow account Fountainhead used is located.

According to Atlantic, "[t]he relevant facts" in this case show that the defendants "had numerous, extensive communications" with Farmer. [D.E. 29] 12; see [D.E. 38] 14–15. These communications include Starley seeking confirmation to wire Atlantic's payment into Starley Law's escrow account, Starley's representations about TBG Tech's ability to secure SGS reports and alternative manufacturers, and Starley's many communications with Farmer as the transaction and the parties' relationship deteriorated. See [D.E. 29] 12–13; [D.E. 38] 14–15. In many of the communications, Starley merely relayed to Farmer information that Floe told to Starley. See, e.g., Starley Decl. [D.E. 35-1] ¶¶ 30, 32–33, 36.

These communications do not justify this court exercising personal jurisdiction over defendants. Starley (and via Starley, Floe and TBG Tech) and Farmer did communicate frequently over the course of months. See, e.g., Ex. I [D.E. 30-9]; Ex. J [D.E. 30-10]; Ex. M [D.E. 30-13]; Ex. N [D.E. 30-14]. As for the nature of the communications, they were communications attempting to manage an existing (and then failing) business deal, the goal of which was to supply a North Carolina company with nitrile gloves.

However, "mere communications sent from outside the forum do[] not establish presence in that jurisdiction." Szulik v. TAG V.I., Inc., 783 F. Supp. 2d 792, 796 (E.D.N.C. 2011); see Stover v. O'Connell Assocs., Inc., 84 F.3d 132, 137 (4th Cir. 1996); Nichols v. G.D. Searle & Co., 991 F.2d 1195, 1198–1200 (4th Cir. 1993); Chung v. NANA Dev. Corp., 783 F.2d 1124, 1126–30 (4th Cir. 1986); Erlanger Mills, Inc. v. Cohoes Fibre Mills, Inc., 239 F.2d 502, 504–08 (4th Cir. 1956); cf. Craig v. Gen. Fin. Corp. of Ill., 504 F. Supp. 1033, 1039 (D. Md. 1980). Stated differently, "although many contacts between the two parties occurred via email, telephone, or instant messaging, such communications do not provide sufficient contacts to justify exercising personal jurisdiction." Cricket Grp., Ltd. v. Highmark, Inc., 198 F. Supp. 3d 540, 544 (D. Md. 2016); see

Pharmabiodevice Consulting, LLC v. Evans, No. GJH-14-00732, 2014 WL 3741692, at *4 (D. Md. July 28, 2014) (unpublished); Springs v. Ally Fin., Inc., No. 3:10-CV-311-RJC-DCK, 2010 WL 4818669, at *9–10 (W.D.N.C. Oct. 14, 2010) (unpublished), report and recommendation adopted, 2010 WL 4823242 (W.D.N.C. Nov. 19, 2010) (unpublished); Johansson Corp. v. Bowness Constr. Co., 304 F. Supp. 2d 701, 706 (D. Md. 2004). Accordingly, the parties' communications, standing alone, cannot justify this court exercising personal jurisdiction over the defendants, especially when all seven other factors weigh against the exercise of personal jurisdiction.

In opposition, Atlantic argues the parties' communications are sufficient, relying on Vishay Intertechnology, Inc. v. Delta International Corp., 696 F.2d 1062 (4th Cir. 1982). See [D.E. 29] 13–15. In Vishay, the United States Court of Appeals for the Fourth Circuit concluded that personal jurisdiction existed based on numerous telephone and written communications and the defendant serving the plaintiff with abusive service of process in the forum state. See Vishay, 696 F.2d at 1064, 1067. However, the defendant's abusive service of process in Vishay is a qualitatively different contact with the forum state than any of the contacts here. Moreover, in Stover and Consulting Engineers, the Fourth Circuit rejected assertions of personal jurisdiction on the basis of telephone and email communications alone. See Consulting Eng'rs, 561 F.3d at 279–81 (rejecting personal jurisdiction where "the contacts that support . . . jurisdiction consist of approximately four telephone conversations and twenty-four emails"); Stover, 84 F.3d at 137 (concluding that "electronic connection . . . does not establish [a party's] 'presence' in that jurisdiction"). Indeed, in Erlanger Mills, defendant's representative from New York flew to North Carolina to discuss plaintiff's dissatisfaction with goods that plaintiff received in New York, and the Fourth Circuit held that the communications between the parties in New York and North Carolina and the representative's flight from New York to North Carolina were insufficient to create personal

jurisdiction. See Erlanger Mills, 239 F.2d at 504–08. Thus, the nature and quality of the parties' communications do not create personal jurisdiction in this case.

Atlantic has not established by a preponderance of the evidence that defendants have the requisite minimum contacts with North Carolina to warrant this court exercising personal jurisdiction. As a result, even though Atlantic's claims arise from and relate to defendants' conduct, the claims do not arise from or relate to conduct directed at North Carolina. See Ford Motor Co., 141 S. Ct. at 1026–32; UMG Recordings, 963 F.3d at 354–55; Fidrych, 952 F.3d at 138–44; Sneha Media & Ent., 911 F.3d at 198–201; Perdue Foods, 814 F.3d at 188–92; Consulting Eng'rs, 561 F.3d at 278–82.

2.

Atlantic argues that personal jurisdiction is nonetheless warranted because "the [c]ourt may exercise personal jurisdiction over a nonresident defendant who acts intentionally to cause harm to a resident's legally protected interest, even if the defendant otherwise lacks contacts with the forum state." [D.E. 29] 13; see [D.E. 38] 13. Because defendants' conduct caused Atlantic a $1 million loss in North Carolina, Atlantic argues the effect of defendants' conduct warrants exercising personal jurisdiction over them. See [D.E. 29] 12–13; [D.E. 38] 16–17.

In support, Atlantic cites Calder v. Jones, 465 U.S. 783 (1984). In Calder, the Court held that a Florida publisher could be haled to court in California for a libelous article drawn from California sources that was widely circulated in California and caused reputational harm to the plaintiff in California. See Calder, 465 U.S. at 788–89. In Calder, "California [was] the focal point both of the [article] and of the harm suffered." Id. at 789. Thus, the Court held that personal jurisdiction over the defendants was proper "based on the 'effects' of their Florida conduct in California." Id.

Case 7:20-cv-00236-D   Document 43   Filed 09/30/21   Page 27 of 28

Calder does not help Atlantic. Although Calder examined the effects caused by the defendants' conduct, the Court still "properly focuse[d] on the relationship among the defendant, the forum, and the litigation." Id. at 788 (quotation omitted). Indeed, the Calder Court "examined the various contacts the defendants had created with California (and not just with the plaintiff) by writing the allegedly libelous story." Walden, 571 U.S. at 287 (emphasis added). Furthermore, "Calder made clear that mere injury to a forum resident is not a sufficient connection to the forum." Id. at 290. Instead, the injury a defendant causes is "jurisdictionally relevant only insofar as it shows that the defendant has formed a contact with the forum State." Id. Thus, although the injury defendants caused to Atlantic is a relevant consideration in the personal jurisdiction analysis, it alone does not justify exercising personal jurisdiction because defendants did not cause the injury through a course of "forum-focused" conduct. See id. Accordingly, Calder's "effects" test does not help Atlantic to establish personal jurisdiction by a preponderance of the evidence.

## B.

Atlantic has not established that defendants purposefully availed themselves of the privilege of conducting activities in North Carolina. On that basis, the court cannot exercise personal jurisdiction over the defendants, and the court need not examine whether it would be constitutionally reasonable to do so had the requisite minimum contacts been present in this case.

## IV.

In sum, the court GRANTS defendants' motions to dismiss [D.E. 23, 35] and DISMISSES WITHOUT PREJUDICE the amended complaint for lack of personal jurisdiction.

SO ORDERED. This **30** day of September, 2021.

JAMES C. DEVER III
United States District Judge

Case 7:20-cv-00236-D   Document 43   Filed 09/30/21   Page 28 of 28